UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| WILLIAM CASEY, | : |
| Plaintiff | : |
| v. | : Civil Case No. _____ |
| ST. MARY'S BANK, | : |
| Defendant | : **JURY TRIAL DEMANDED** |

# COMPLAINT

## INTRODUCTION

1. Plaintiff William Casey seeks to recover lost wages and benefits and liquidated damages from Defendant St. Mary's Bank for violations of the Uniformed Services Employment and Reemployment Rights Act of 1994, 38 U.S.C. § 4301 *et seq.*, for breach of contract, and for wrongful termination under a constructive discharge theory.

## PARTIES

2. Plaintiff William Casey ("Casey") is an individual who resides at 4 Birchwood Drive, Derry, New Hampshire 03038.

3. Defendant St. Mary's Bank ("St. Mary's" or "the Bank") is a credit union with its headquarters located at 200 McGregor Street, Manchester, New Hampshire 03102 and with branches throughout New Hampshire. St. Mary's is a federally insured state-chartered credit union with a charter number of 63829.

4. Casey worked at the St. Mary's branch at 234 Elm Street, Manchester, New Hampshire from December 2, 2019, until December 18, 2021.

**JURISDICTION & VENUE**

5. The Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because Casey alleges violations of the Uniformed Services Employment and Reemployment Rights Act of 1994, 38 U.S.C. § 4301 *et seq.* ("USERRA").

6. The Court has supplemental jurisdiction over the state-law breach of contract claims pursuant to 28 U.S.C. § 1367.

7. Venue in the District of New Hampshire is proper based on 28 U.S.C. § 1391(b)(1) because St. Mary's is a New Hampshire entity.

**FACTS**

Plaintiff's Employment and St. Mary's Discrimination

8. On December 2, 2019, Casey began working at St. Mary's as a Sales and Service Representative, making $20 per hour.

9. Casey informed St. Mary's when he was hired that he was a member of the Massachusetts National Guard and provided St. Mary's with his drill schedule.

10. In June of 2020, in the midst of the COVID-19 pandemic, the Commonwealth of Massachusetts declared a state of emergency and activated its National Guard to help with unemployment affairs. Casey gave St. Mary's three weeks' notice of his impending activation.

11. St. Mary's informed Casey that, while he was on active duty, he would not be provided with the Bank's health insurance, and he would have to re-sign up for health insurance when he returned from active duty. St. Mary's also made him sign up for Continuation of Health Coverage through COBRA.

12. St. Mary's informed Casey that he would not accrue Paid Time Off ("PTO") while he was on active-duty leave.

13. Casey was on active duty in Massachusetts from June of 2020 to June of 2021.

14. According to St. Mary's policy, Casey should have been paid the difference between his military pay and his straight-time pay for up to 12 months of active duty leave.

15. St. Mary's did not pay Casey the difference between his military pay and his straight-time pay for any of the period during which he was on active duty leave.

16. On May 20, 2021, Branch Manager Cathy Gagnon ("Gagnon") reached out to Casey, texting, "Are you ready for June 1, they need to release you, I can't hold your seat past June 1. Please come back, let me know."

17. Gagnon continued, "If you can't come by June 1, I will fill your position. If you can, your seat at Elm is secure." Gagnon also added, "I have held this position for you because you are amazing and worth it."

18. Casey informed Gagnon that he would be able to return in June but that he would have continued training obligations.

19. Upon Casey's return, St, Mary's violated several USERRA provisions and its own employment policies in re-onboarding Casey.

20. First, St. Mary's told Casey that he would have to wait 90 days before receiving benefits.

21. Casey informed the Bank that forcing him to wait for benefits was in violation of federal law.

22. When the Bank stuck to its original position, Casey reported the Bank's violation to the Employer Support of the Guard and Reserve ("ESGR").

23. After a conversation with ESGR, St. Mary's reinstated Casey's health insurance.

24.     Second, it was St. Mary's policy that Casey would receive a raise pursuant to the annual reviews and raises he missed while on active duty.

25.     However, St. Mary's did not complete Casey's annual review for the period of December 2, 2019, to December 2, 2020 ("2020 review"), until July of 2021.  Gagnon served as the "appraiser" for Casey's review.

26.     Casey received a 3.45 out of 5 rating on his 2020 review.  Casey fell short of one of his goals, receiving a 2.75 rating out of 5 under "Meeting Loan Production goals and CUNA add-on-goals as measured by sales reports."  In explaining Casey's low rating, Gagnon wrote, "Billy booked $251,915 in total loans, his prorated goal was $355,031 which is 71% of his goal.  He was just beginning to build a pipeline when he was called to serve for the Mass National Guard.  CUNA add on results, 78% for life, 0 for disability and 0 for GAP.  Billy had been building momentum in this key result area but was called away before his efforts could reach fruition."

27.     The low rating was a result of St. Mary's not adequately prorating Casey's goals based on his military absence.

28.     As Casey stated in his comments to his self-evaluation, he "was at 188% [of his] loan Goal for Q1 but wasn't able to work on an Equity loan during that time.  [For] CUNA Life[, he] was at 106% but disability wasn't achieved."

29.     Casey only worked Q1 and part of Q2 before being called to active duty in 2020.

30.     In response to Casey's request to prorate his goals on his 2020 review, Gagnon said that his service was not an excuse to treat him differently sales-goals wise.  Specifically, Gagnon told Casey, "We're not giving you extra credit toward your goals" and "Just because you're in the military doesn't mean you get to slack off."

31. St. Mary's did not adequately account for Casey's active duty leave in calculating his time employed by the Bank.

32. The score of an employment evaluation at St. Mary's directly affects the percentage raise an employee receives. The result for Casey was a meager raise of 65 cents per hour.

33. Third, upon Casey's return, St. Mary's took back the PTO Casey had accrued while on active duty leave and reversed his available PTO hours to the amount he had before his active-duty leave.

34. Additionally, St. Mary's made Casey use his PTO to cover mandatory military training days between June and December of 2021.

35. Towards the end of 2021, Casey felt a shift in the attitudes of his co-workers and supervisors, hearing snide comments about his military service, specifically claiming that he was unwilling to cover shifts because he was "always on military leave."

36. Management also openly favored other employees when assigning loans in queue and was unwilling to review trainings that Casey missed while on military leave.

37. After Thanksgiving of 2021, Casey asked for his year-end review ("2021 review"), and questioned St. Mary's military PTO policy.

38. In response, Assistant Branch Manager Julie Gibbons ("Gibbons") asked for help on how to block off his schedule for training then contacted Human Resources ("HR") to ask about his 2021 review and prorations.

39. During this discussion, Gibbons texted Casey, "do you think it's fair you get full-time benefits from St. Mary's when you don't work full-time." Casey responded that he did work full-time, and explained, "SMB is going to offset every military weekend with my PTO[.] So I

effectively work every day and never get vacation because all my PTO goes to covering military[.]"

40. Gibbons responded, "Well I guess as an outsider looking in for me you chose to be in the military and [t]hey are giving you PTO when you don't work in the office 40 hours a week."

41. Trying to resolve the PTO issue, Casey also had a conversation with Senior Human Resources Lead Merideth Gurall ("Gurall") about his 2021 review, prorating goals, and his coding schedule.

42. Gurall told Casey that military leave is the same as medical and the company allowed 11 days before using PTO.

43. Gurall told Casey that he would be forced to use PTO days accrued to cover any military leave of absence for training until his PTO ran out, and the remainder would be unpaid. Casey told her that any such policy was in violation of USERRA.

44. In response, Gurall said, "that's just how things are" and "we all make our choices, Billy."

45. Casey again contacted ESGR, who contacted St. Mary's about its policies.

46. On December 3, 2021, Casey sent a letter to Human Resources Director Pam Roy ("Roy"), expressing his concerns about the difficulties he had had with Ms. Gurall in creating a schedule that accommodated his military training leave.

47. On December 3, 2021, District Manager Damian Gunther ("Gunther") admonished Casey for speaking to HR before talking to his manager. Gunther told Casey that going straight to HR was unprofessional.

48. The next day, on December 4, 2021, Gunther called Casey back and told him not to tell any of his coworkers about what was going on.

49. On December 5, 2021, Casey gave St. Mary's his two-weeks' notice.

50. On December 7, 2021, Roy called Casey about Gurall's behavior and said that Gurall might have misspoken but the policies were fine. Roy said that it was just a misinterpretation by Gurall. Roy did not explain the correct interpretation, however.

51. On December 9, 2021, Casey met with Roy for an exit interview. He voiced his concerns about pay and vacation time.

52. On December 10, 2021, St. Mary's completed Casey's 2021 review. Gagnon again served as "appraiser." Casey received a cumulative 2.81 rating out of a possible 5.

53. Casey received a 2.7 out of 5 for his "Goals" section, which accounted for 65% of his final score. His goals were not properly prorated to account for his six weeks of training leave between June and December 2021.

54. On December 15, 2021, Casey emailed Roy to express his concerns about the 2021 review. He explained that he felt that his military service had not been properly factored into his review and impacted his score.

55. Casey's last day as an employee of St. Mary's was December 18, 2021.

Relevant Contractual Provisions

56. St. Mary's Employee Handbook (the "Handbook") contains an Equal Employment Opportunity Policy which states that "[n]o person is to be discriminated against in employment because of race, religion, color, gender, age, marital status, national origin, sexual orientation, veteran status, disability, or **any other protected status**." (emphasis added). The Handbook states that the policy applies "to all terms, conditions, and privileges of employment including, but not limited to, hiring, training, promotions, transfers, demotions, communications, working conditions

and facilities recreation, compensation, benefits, educational assistance, terminations, and retirement."

57. Casey was discriminated against by St. Mary's because of his military status and denied the benefits and privileges of employment including but not limited to promotions, compensation, and benefits.

58. The Handbook also contains a Military Policy which states that "[r]egular employees serving in the Military Reserves or National Guard will be granted military leave to enable them to attend training as reservists or guard members."

59. The Military Policy states that "eligible employees will be paid the difference between their military pay and their regular straight-time pay for up to ten days of training leave each calendar year."

60. St. Mary's did not pay Casey the difference between his military pay and his straight-time pay for any of the days that he was on training leave between June and December, 2021.

61. The Military Policy also states that "[r]egular employees who are military reservists or National Guard members and who are called to active duty will be paid the difference between their military pay and their regular straight-time pay for up to 12 months."

62. St. Mary's did not pay Casey the difference between his military pay and his straight-time pay for any of the 12-month period he was on active duty leave from June 2020 to June 2021.

## COUNT I
## 38 U.S.C. § 4311(a)

63. Casey re-alleges and incorporates by reference all paragraphs as if fully restated herein.

64. Under Subchapter II of USERRA, "[a] person who is a member of, applies to be a member of, performs, applies to perform, or has an obligation to perform service in a uniformed service shall not be denied initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership, application for membership, performance of service, application for service, or obligation." 38 U.S.C. § 4311(a).

65. Benefits of employment include "any advantage . . . that accrues by reason of an employment contract or agreement or an employer policy, plan, or practice." 38 U.S.C. § 4303(2).

66. An employer who takes adverse employment action against a uniformed servicemember violates this provision when "the person's membership, application for membership, service, application for service, or obligation for service in the uniformed services is a motivating factor in the employer's action." 38 U.S.C. § 4311(c)(1).

67. Casey spent 12 months on active duty leave between June 2020 and June 2021. Casey spent nearly six weeks of between June and December 2021 on mandatory training leave.

68. St. Mary's took adverse action against Casey when it failed to properly account for his active duty leave in conducting his 2020 review by failing to prorate his goals, leading to a poor review with a detrimental effect on his wage.

69. St. Mary's took adverse action against Casey when it chose not to properly account for his training leave conducting his 2021 review by failing to prorate his goals, leading to a poor review with a detrimental effect on his wage.

70. By failing to account for Casey's leave in determining his goals for both his 2020 and 2021 reviews, leading to poor reviews with detrimental effects on his wage, St. Mary's violated

USERRA's prohibition against denying service members "any benefit of employment." 38 U.S.C. § 4311(a).

## COUNT II
## 38 U.S.C. § 4313(a)(2)(A)

71.     Casey re-alleges and incorporates by reference all paragraphs as if fully restated herein.

72.     Employers must conform with USERRA's "escalator principle." 20 C.F.R. § 1002.191. That is, upon completion of a period of service, an employee who serves in the uniformed services must be promptly reemployed "in the position of employment in which the person would have been employed if the continuous employment of such person with the employer had not been interrupted by such service, or a position of like seniority, status, and pay, the duties of which the person is qualified to perform." 38 U.S.C. § 4313(a)(2)(A).

73.     In determining the employee's proper reemployment position, the "escalator position" is the starting point. 20 C.F.R. § 1002.192.

74.     The escalator principle requires that a returning service member be reemployed "in a position that reflects with reasonable certainty the pay, benefits, seniority, and other job perquisites that he or she would have attained if not for the period of service." 20 C.F.R. § 1002.191.

75.     Upon Casey's return from active duty leave in June 2021, St. Mary's failed to employ him in a position that reflects with reasonable certainty the pay, benefits, seniority, and other job perquisites that he would have attained if not for his active-duty absence.

76.     By delaying Casey's 2020 annual review, failing to prorate his goals on his 2021 annual review to account for his active-duty military service, failing to account for his service in

calculating his hourly wage, and failing to give him pay raises that he would have earned but for his military absence, St. Mary's violated 38 U.S.C. § 4313(a)(2)(A).

## COUNT III
### 38 U.S.C. § 4316(a)

77. Casey re-alleges and incorporates by reference all paragraphs as if fully restated herein.

78. A person reemployed under USERRA is entitled to the rights and benefits that he or she had on the date of commencement of service, plus "the additional seniority and rights and benefits that such person would have attained if the person had remained continuously employed." 38 U.S.C. § 4316(a).

79. Those rights and benefits include "any advantage, profit, privilege, gain, status, account, or interest" which accrues by reason of contract, agreement, policy, plan, or practice, and includes rights and benefits under "a health plan," "insurance coverage and awards," "bonuses," "vacations," and "the opportunity to select work hours or location of employment." 38 U.S.C. § 4303(2).

80. By taking away the PTO Casey had accrued while on active-duty leave and reversing his available PTO hours to the amount he had accrued before his active-duty absence, St. Mary's violated 38 U.S.C. § 4316(a).

## COUNT IV
### 38 U.S.C. § 4316(d)

81. Casey re-alleges and incorporates by reference all paragraphs as if fully restated herein.

82. No employer may require a service member whose employment is interrupted by a period of service in the uniformed services "to use vacation, annual, or similar leave during such period of service." 38 U.S.C. § 4316(d).

83. USERRA defines "service in the uniformed services" to include active duty as well as "active duty for training," "initial active duty for training," and "inactive duty training" in addition to other types of active duty. 38 U.S.C. § 4303(13).

84. By forcing Casey to use his PTO to cover leave for training between June and September of 2021, St. Mary's violated 38 U.S.C. § 4316(d).

## COUNT V
### Breach of Contract ("Equal Employment Opportunity Policy")

85. Casey re-alleges and incorporates by reference all paragraphs as if fully restated herein.

86. Under New Hampshire law, "an employer's promulgation of an employee handbook or policy statement to its employee may constitute a unilateral contract offer that the employee accepts by continuing to work at his job." *Balsamo v. Univ. Sys. of N.H.*, No. 10-cv-500-PB, 2012 WL 683491, at *8 (D.N.H. Mar. 2, 2012) (summarizing the holding in *Panto v. Moore Bus. Forms, Inc.*, 130 N.H. 730, 736-37 (1988)).

87. Even when a handbook contains a disclaimer indicating that it does not create contractual obligations, the handbook's individual terms and policies may still become enforceable features. *Butler v. Walker Power*, 137 N.H. 432, 436 (1993).

88. St. Mary's "Equal Employment Opportunity Policy" states that "[n]o person is to be discriminated against in employment because of race, religion, color, gender, age, marital status, national origin, sexual orientation, veteran status, disability, or **any other protected status**." (emphasis added). It further states that the policy applies "to all terms, conditions, and privileges

of employment including, but not limited to, hiring, training, promotions, transfers, demotions, communications, working conditions and facilities recreation, compensation, benefits, educational assistance, terminations, and retirement."

89. Casey was discriminated against by St. Mary's on account of his uniformed service and denied the "privileges of employment" including compensation and benefits that he would have accrued but for his leave.

90. By discriminating against Casey and denying him such privileges, St. Mary's breached the unilateral contract created by its policy and assented to by Casey's continued employment.

## COUNT VI
### Breach of Contract ("Military Policy")

91. Casey re-alleges and incorporates by reference all paragraphs as if fully restated herein.

92. An employer's promulgation of a handbook constitutes a unilateral contract offer which an employee may accept by continuing to work at his job. *Balsamo*, 2012 WL 683491, at *8.

93. St. Mary's "Military Policy" states that "[r]egular employees who are military reservists or National Guard members and who are called to active duty will be paid the difference between their military pay and their regular straight-time pay for up to 12 months."

94. St. Mary's "Military Policy," like its "Equal Employment Opportunity Policy," constituted a unilateral contract offer which Casey accepted by continuing to work at St. Mary's.

95. Per the terms of that policy, St. Mary's agreed to pay Casey the difference between his military pay and his straight-time pay for up to 12 months of active duty.

96. By failing to pay Casey the difference in pay which was promised in the "Military Policy" for the period from June 2, 2020, to June 7, 2021, during which Casey was on active-duty leave, St. Mary's breached the contract created by its policy and assented to by Casey's continued employment.

## COUNT VII
### Breach of Contract ("Military Policy")

97. Casey re-alleges and incorporates by reference all paragraphs as if fully restated herein.

98. An employer's promulgation of a handbook constitutes a unilateral contract offer which an employee may accept by continuing to work at his job. *Balsamo*, 2012 WL 683491, at *8.

99. St. Mary's own "Military Policy" states eligible employees will be paid the difference between their military pay and their straight-time pay for up to ten days of training leave each calendar year.

100. Casey was on training leave for nearly six weeks between June and December of 2021. Casey was not paid the difference between his military pay and his straight-time pay for any of those days.

101. By failing to pay Casey the difference between his military and straight-time pay for at least ten of the days he spent on training leave, the Bank breached the contract it created in its "Military Policy."

## COUNT VIII
### Wrongful Termination (Constructive Discharge)

102. Casey re-alleges and incorporates by reference all paragraphs as if fully restated herein.

103. To state a claim for constructive discharge, a plaintiff must allege that the employer rendered his "working conditions so difficult and intolerable that a reasonable person would feel forced to resign." *Karch v. BayBank FSB*, 147 N.H. 525, 536 (2002).

104. Casey was having difficulties with each member of the HR team and receiving no assistance with his military training leave time and no appropriate consideration and compensation for his military training leave.

105. Even when presented with the federal law, HR refused to comply.

106. The constant battling with HR to have his military training leave appropriately accounted for under federal law rendered his working conditions so difficult and intolerable that a reasonable person would have felt forced to resign.

WHEREFORE, Casey respectfully requests that this Court:

A. Enter judgment against St. Mary's Bank on all counts;

B. Order St. Mary's to pay damages for its violation of USERRA;

C. Order St. Mary's to pay liquidated damages equal to the amount of lost wages and benefits pursuant to 38 U.S.C. § 4323(d)(1)(C);

D. Order St. Mary's to pay damages for its breaches of contract;

E. Order St. Mary's to pay damages for its wrongful termination of Casey;

F. Award Casey the reasonable costs of this action, including attorney's fees; and

G. Grant such other and further relief as this Court deems equitable and just.

Dated: July 13, 2022                                    Respectfully submitted,

/s/ *Olivia F. Bensinger*
Olivia F. Bensinger (NH Bar #274145)
SHAHEEN & GORDON, P.A.
107 Storrs Street, P.O. Box 2703
Concord, NH 03302
(603) 225-7262
obensinger@shaheengordon.com

*Attorney for plaintiff William Casey*