UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

<u>William Casey</u>

    v.                                    Case No. 1:22-cv-00252-PB
                                           Opinion No. 2024 DNH 041

<u>St. Mary's Bank</u>

## MEMORANDUM AND ORDER

William Casey sued his former employer, St. Mary's Bank (SMB), for violating the Uniformed Services Employment and Reemployment Rights Act of 1994 (USERRA) and wrongfully terminating him. SMB now moves for summary judgment on both of Casey's claims. For the reasons set forth below, I grant SMB's motion for summary judgment (Doc. 20) as to Casey's USERRA claim but deny it as to his wrongful termination claim.

## I. BACKGROUND

Casey worked at SMB as a sales and services representative from December 2019 until December 2021. Doc. 20-2 at 20-21, 24, 85. He typically worked Tuesdays through Saturdays, and he was responsible for welcoming customers and assisting them with various financial matters. Id. at 25, 39.

Throughout his tenure at SMB, Casey was also a member of the Massachusetts National Guard. Doc. 21-1 at 1. As a member of the Guard,

Casey was required to attend monthly weekend trainings for nine months of the year and two weeks of annual training every August. Id.

Casey informed SMB of his military commitments when he was hired. Doc. 16 at 2. Shortly thereafter, SMB provided Casey with its "Employee Electronic Manual" (Manual). See Doc. 8-1 at 10. The Manual includes a "Military Leave Policy" that entitles military employees to "retain certain rights with respect to reinstatement, seniority, layoffs, compensation, and benefits as required by [USERRA] and any other applicable federal or state laws." Doc. 20-13 at 1. The policy includes two key provisions: an "Annual Training" provision and an "Active Duty" provision. Id. at 1-2. The Annual Training provision provides in relevant part that:

> Regular employees serving in the Military Reserves or National Guard will be granted military leave to enable them to attend training as reservists or guard members. In this case, eligible employees will be paid the difference between their military pay and their regular straight-time pay for up to ten days of training leave each calendar year (assuming their military pay is less than their regular pay from [SMB]). . . . If additional time is needed to fulfill reservist or guard training obligations, an employee may take unpaid leave or banked Paid Time Off (PTO) for this purpose.

Id. at 1. The Active Duty provision similarly provides that:

> Regular employees who are military reservists or National Guard members and who are called to active duty, will be paid the difference between their military pay and their regular straight-time pay for up to 12 months (assuming that their military pay is less than their regular pay from [SMB]).

Id. at 2.

SMB's Manual also includes a "Paid Time Off (PTO) Policy" in which eligible employees accrue PTO on a biweekly basis according to their employment status and years of consecutive service. Doc. 20-14 at 4-5. PTO may then be used for "vacation, personal time, personal illness, or family illness." Id. at 1. However, "[t]ime off regarding company holidays, jury duty, military duty, and funeral leave do not fall under the PTO Policy and are covered under separate [SMB] Policies." Id. (emphasis in original).

Between December 2019 and May 2020, Casey worked at SMB and attended his monthly weekend military trainings. Doc. 20-2 at 25. On these weekends, Casey was forced to miss his regularly scheduled Saturday shifts at SMB. Id. at 26-17. To "offset" his military time, SMB began to schedule Casey to work on one Monday per month that he otherwise would have had off. Id.

In the spring of 2020, Massachusetts activated its National Guard to respond to various issues arising from the COVID-19 pandemic. Doc. 16 at 2. Casey served on state active duty from May 2020 until June 2021, helping the state process a flood of resulting unemployment claims. Doc. 20-2 at 28, 37. During this period, Casey did not work any shifts at or receive any pay from SMB, see id. at 38, 110, and he was not eligible for certain benefits, such

3

as the ability to accrue PTO or participate in the bank's health insurance plan, Doc. 16 at 2; see Doc. 20-14 at 4-5; Doc. 20-13 at 2.

While Casey was on active duty, he remained in contact with his branch manager. Doc. 21-7. In May 2021, nearly a year into Casey's leave, his branch manager texted him to say that she had held his position for him because he was "amazing and worth it" and to ask whether he would be returning to SMB by June 1. Id. at 8. She wrote that the military "need[s] to release you" and "[i]f you can't come by June 1, I will fill your position. If you can, your seat at [the branch] is secure." Id. Casey responded that he would, in fact, be returning to work in early June 2021, and his branch manager replied, "The job is yours!" Id. at 9. She then noted that the military "took their pound of flesh and then some" and asked whether it "want[ed] [him] to give up a chance at a career or keep [him] in the Army?" Id.

Casey's active duty service ended in early June 2021, and he resumed his regular shifts at SMB as well as his monthly Guard trainings. Doc. 20-2 at 38, 62. Upon his return, one of SMB's human resources specialists informed Casey that his benefits would not be reinstated until the first full month of his reemployment, as was the bank's policy for new hires. Id. at 39-40; see Doc. 20-6 at 2. Casey believed that his benefits should begin immediately, and he raised the issue with the Employer Support of the Guard and Reserve (ESGR), an office within the Department of Defense

dedicated to supporting relations between employers and their military employees and resolving conflicts under USERRA. Doc. 20-2 at 40-41. Around the same time, the human resources specialist reached out to the bank's benefits provider for clarification on Casey's rights under federal law. Doc. 20-6 at 2. The benefits provider stated that Casey could not be subject to any waiting periods, id. 1, and shortly thereafter, Casey's benefits were reinstated, Doc. 20-2 at 42.

 Upon his return to SMB, Casey also invoked his rights under the Manual's Active Duty provision to recover what he claimed was the difference between his military pay and his regular pay at SMB. See Doc. 20-2 at 109-10. Although Casey asserts that he provided SMB with records supporting his pay differential claim, the bank failed to provide him with any additional compensation for the time he was on active duty. Id.

 Over the next several months, Casey continued to balance his work at SMB with his military obligations. He attended his two weeks of annual training in August 2021, for which he was not required to use PTO, and continued to attend his monthly trainings. Id. at 60-61. But in late November 2021, Casey's supervisors informed him that, in order to cover his weekend military leave, he would either have to work additional hours on Monday or use his accrued PTO "until it was exhausted." Id. at 63. Casey contested this practice and expressed his discontent to SMB's management, including his

5

assistant branch manager, who subsequently removed him from the schedule altogether. Doc. 21-10 at 2-3. Casey texted her a copy of the schedule and wrote, "I said I won't work Monday so you remove me from the entire schedule." Id. at 3. She responded, "Lol yup." Id. They continued to text about the schedule and SMB's new PTO policy over the next several days. Casey explained that he was planning to use PTO to cover the Monday shift and that human resources could reimburse him the PTO hours once the "conflict" between SMB's policy and USERRA was resolved. Id. at 5. His assistant branch manager responded that SMB's policy and the government's policy "could be two different things." Id. at 6. She also asked whether Casey thought it was "fair" that he got full-time benefits from the bank when he "[didn't] work full-time." Id. Casey explained that he did work full-time and that by requiring him to "offset every military weekend" with PTO, all his PTO would be applied to his military obligations, effectively depriving him of any actual time off. Id. His assistant branch manager retorted that Casey "chose to be in the military," and SMB was "giving [him] PTO when [he didn't] work in the office 40 hours a week." Id.

    Casey was then directed to discuss his concerns regarding the PTO policy with SMB's assistant vice president, who also served as the human resources manager. Doc. 20-10; see also Doc. 21-3 at 7. She reiterated that Casey was required to use his accrued PTO to cover the Monday shift until it

was exhausted, at which point the remainder of his military leave would be unpaid. Doc. 20-10; Doc. 21-3 at 22-23. Casey noted that SMB's Annual Training Policy provides 10 days of differential pay per year for military trainings but makes no mention of any requirement to exhaust available PTO for excess leave. Doc. 20-10. He also reiterated his concern that under SMB's practice, he would not accrue enough PTO to cover his monthly military trainings and would constantly be in a PTO deficit. Id. The assistant vice president simply repeated the policy and, seemingly referring to Casey's military service, said, "we all make choices." Id. She also commented that she would bring the issue to the bank's board of directors so that the policy could be rewritten more clearly and in a manner that "someone like [Casey] would understand." Id.

Frustrated by this conversation, Casey again reached out to ESGR for clarification regarding his rights under federal law. See Doc. 20-9 at 2. A representative from ESGR emailed him several sections of USERRA's implementing regulations, which state that an employer "may not require [an] employee to use accrued vacation, annual, or similar leave during a period of service in the uniformed services." Id. (quoting 20 C.F.R. § 1002.153(b)). The email also explained that employers "should not change the work schedule (or use the drill schedule to develop the civilian work schedule) so that Service members' days off fall on drill weekends unless all parties

7

agree to that change. . . . The Service member is not required to make up time missed performing duty." Id. at 3.

Casey then reached out to the bank's senior vice president, who also served as the director of human resources, to forward the information he received from ESGR, id. at 1, as well as express his concerns regarding SMB's policy and his conversation with the assistant vice president, Doc. 20-10. The senior vice president responded that she would "look[] into" Casey's situation and assured him that he had her "commitment to resolve" the matter. Doc. 20-9 at 1. She then asked for some time to review the issue and whether he was available to speak with her the following Monday, his day off. Id.

The following day, prior to any in-person discussions with the senior vice president, SMB's regional manager visited Casey's branch to discuss his concerns. Doc. 20-2 at 86-87. The regional manager "commended [Casey's] work ethic and [his] contributions" to SMB but told Casey that he should not be complaining "loud[ly] enough for other employees to have to listen to" Casey's concerns." Id. Casey asserts that he did not discuss his concerns with any non-supervisory employees and viewed the regional manager's comment as a reprimand for "pursu[ing]" his rights under USERRA. Id. at 119, 122.

Casey handed in his two-week resignation notice the next day. Doc. 20-11. A few days later, Casey emailed SMB's director of human resources to "follow[] up" on his differential pay from when he was out on active duty as

8

well as for his military trainings since his return to the bank. Doc. 20-12 at 2. She explained that she needed copies of all of Casey's paystubs from his service so that she could compare his military and bank pay and calculate any difference to be paid. Id. Though Casey did not respond to her email, he asserts that during his exit interview the following day, he had "additional conversations" with the director about his differential pay, and it "was known" that his branch manager had copies of each of his pay stubs from his active duty service. Doc. 20-2 at 110. He further admits that he never provided his paystubs for his military trainings between June and December 2021. See id. at 112.

Shortly after resigning, Casey became concerned he would not be able to find a replacement job and reached out to the senior vice president to rescind his resignation. Doc. 21-1 at 3. The senior vice president referred Casey's request to his branch manager, who responded that "it's best we accept his resignation" because "his values do not appear to line up completely with SMB's pulling together philosophy." Doc. 21-11 at 3. Consequently, the senior vice president accepted his resignation. Id. at 2; Doc. 21-1 at 3.

Casey filed suit in this court the following July, seeking compensation for lost benefits and wages as well as liquidated damages. Doc. 1; Doc. 16. His complaint included several claims for violations of USERRA as well as a

9

claim for wrongful termination in violation of New Hampshire common law.[1] Doc. 16.

## II.   STANDARD OF REVIEW

Summary judgment is warranted when the record shows "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Tang v. Citizens Bank, N.A., 821 F.3d 206, 215 (1st Cir. 2016). A "material fact" is one that has the "potential to affect the outcome of the suit." Cherkaoui v. City of Quincy, 877 F.3d 14, 23 (1st Cir. 2017) (quoting Sanchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)). A "genuine dispute" exists if a factfinder could resolve the disputed fact in the nonmovant's favor. Ellis v. Fid. Mgmt. Tr. Co., 883 F.3d 1, 7 (1st Cir. 2018).

The movant bears the initial burden of presenting evidence that "it believes demonstrate[s] the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); accord Irobe v. U.S. Dep't of Agric., 890 F.3d 371, 377 (1st Cir. 2018). Once the movant has properly

---

[1]   Casey also brought three breach of contract claims against SMB, alleging that the bank violated its Military Policy by discriminating against him on the basis of his military service and failing to pay him the difference between his military pay and his bank pay while he was on state active duty or attending weekend trainings. Doc. 1 at 12-14. I granted SMB's motion to dismiss the breach of contract claims based on my conclusion that the Manual did not constitute an enforceable contract. Doc. 14.

presented such evidence, the burden shifts to the nonmovant to designate "specific facts showing that there is a genuine issue for trial," Celotex, 477 U.S. at 324, and to "demonstrate that a trier of fact could reasonably resolve that issue in [its] favor," Irobe, 890 F.3d at 377 (quoting Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010)). If the nonmovant fails to adduce such evidence, the motion must be granted. Celotex, 477 U.S. at 324. In considering the evidence, the court must draw all reasonable inferences in the nonmoving party's favor. Theriault v. Genesis HealthCare LLC, 890 F.3d 342, 348 (1st Cir. 2018).

### III. ANALYSIS

Casey initially asserted several distinct USERRA claims but he has since abandoned all of those claims except his claim that SMB violated § 4316(b)(1) by failing to reimburse him the difference between his military pay and his regular bank pay, both while he was on active duty and while he was attending military trainings. Doc. 21 at 1. Casey also argues that SMB is liable for wrongful discharge because it constructively terminated him for exercising his USERRA rights. Id. at 2.

SMB asserts that it is entitled to summary judgment on Casey's remaining USERRA claim because it had no statutory obligation to pay Casey any pay differential under § 4316(b)(1). Doc. 24 at 24-5. It also contends that I should grant summary judgment on Casey's wrongful

11

termination claim because he was not constructively discharged, there is no evidence that SMB acted in bad faith, and Casey was not discharged for taking an action that public policy would encourage. Doc. 20-1 at 17-22. I address each argument in turn.

### A.    USERRA Claim

USERRA, codified at 38 U.S.C. 4301 et seq., protects the employment and reemployment rights of those who serve in the military, entitling military employees to certain benefits and imposing various obligations on employers. Myrick v. City of Hoover, 69 F.4th 1309, 1314 (11th Cir. 2023). One such obligation is set forth in § 4316(b)(1), which provides in relevant part that:

> [A] person who is absent from a position of employment by reason of service in the uniformed services shall be—
> (A) deemed to be on furlough or leave of absence while performing such service; and
> (B) entitled to such other rights and benefits not determined by seniority <u>as are generally provided by the employer of the person to employees having similar seniority, status, and pay who are on furlough or leave of absence under a contract, agreement, policy, practice, or plan in effect at the commencement of such service or established while such person performs such service.</u>

38 U.S.C. § 4316(b)(1) (emphasis added). Casey alleges that SMB violated § 4316(b)(1) by "failing to provide [him] the pay accorded to those on a comparable form of leave," Doc. 16 at 12, specifically, leave taken pursuant to SMB's "Family and Medical Leave" (FML) Policy, Doc. 21 at 12-13. SMB, in

12

turn, argues that it was not obligated to reimburse Casey for any pay differential under § 4316(b)(1) because its FML Policy does not provide paid leave aside from an employee's use of accrued PTO. Doc. 24 at 4-5. I agree with SMB.

To be entitled to relief under § 4316(b)(1), a plaintiff must establish that an employer has failed "to provide employees who take military leave with the same non-seniority rights and benefits as their colleagues who take compensable non-military leave." Clarkson v. Alaska Airlines, Inc., 59 F.4th 424, 428 (9th Cir. 2023). However, Casey cannot satisfy this requirement by pointing to SMB's FML Policy because, unlike the Military Leave Policy, it does not provide employees with any form of paid leave apart from the general right to use accrued PTO, which Casey was also free to use to cover his military leave if he wished.[2] Because Casey's pay differential claim asserts a right to additional compensation that is not available to employees under the FML Policy, that policy cannot be a valid comparator for the

---

[2] The Annual Training provision of SMB's Military Policy allows an employee to "take unpaid leave or banked Paid Time Off (PTO)" to cover military training obligations beyond the 10 days of differential pay offered by the bank. Doc. 20-13 at 1. Thus, Casey was in no way precluded from electing to use his PTO to cover his military service. Accordingly, the FML Policy offers no additional pay benefits that were otherwise denied to military employees.

purposes of Casey's § 4316(b)(1) claim.[3] SMB is therefore entitled to summary judgment on this claim.

## B.     Wrongful Termination Claim

Casey's second claim is for wrongful termination.[4] To make out a wrongful termination claim under New Hampshire law, a plaintiff must prove that his employer (1) terminated his employment (2) "out of bad faith, malice, or retaliation" and (3) because he "performed acts that public policy would encourage or because [he] refused to perform acts that public policy would condemn." Donovan v. S.N.H. Univ., 175 N.H. 489, 492 (2022).

Casey alleges that he was constructively discharged contrary to public policy because SMB rendered his working conditions intolerable by

---

[3]     Some courts have found that when an employer elects to provide its military employees with an additional benefit beyond USERRA's mandates, the employees' entitlement to such a benefit is protected under USERRA's anti-discrimination provision, § 4311. See, e.g., Koehler v. PepsiAmericas, No. 1:04cv742, 2006 WL 2035650, at *4 (S.D. Ohio July 18, 2006) (finding that an employer failed to comply with § 4311(a) where it chose to "adopt a policy of providing a benefit of employment equal to the difference between the active-duty employee's military pay" and job pay but, in practice, "denied" the employee that benefit); but see, e.g., Crews v. City of Mt. Vernon, 567 F.3d 860, 866 (7th Cir. 2009) (finding that § 4311(a) only reaches "discriminatory employment actions that provide military employees with fewer benefits" than their non-military colleagues). Casey, however, does not base his pay differential claim on § 4311(a), and he has abandoned his earlier § 4311(a) claims.

[4]     Although the parties in this case are not diverse, and I have granted summary judgment to SMB on Casey's only remaining federal claim, I retain supplemental jurisdiction over Casey's state claim pursuant to 28 U.S.C.

14

consistently violating his rights under USERRA. Doc. 21 at 15-17. SMB, in turn, moves for summary judgment on the ground that Casey has failed to sufficiently establish any elements of his claim. Doc. 20-1 at 17-22. I consider each element in turn.

1.   Constructive Discharge

As an initial matter, to prevail on a wrongful termination claim, an employee must have been terminated. See Donovan, 175 N.H. at 492. However, the New Hampshire Supreme Court has held that "constructive discharge satisfies the termination component of a wrongful discharge claim." Karch v. BayBank FSB, 147 N.H. 525, 536 (2002).

Constructive discharge occurs "when an employer renders an employee's working conditions so difficult and intolerable that a reasonable person would feel forced to resign." Boucher v. Town of Moultonborough, No. 2022-0500, 2023 WL 7576927, at *2 (N.H. Nov. 15, 2023). It generally requires that the working conditions be "ongoing, repetitive, pervasive, and severe." Lacasse v. Spauling Youth Ctr., 154 N.H. 246, 249 (2006) (quoting

---

§ 1367, which neither party contests. Given that this case is now in its final stages, with discovery completed and a trial date imminently approaching, and considering that the state law claim does not present any novel or complex issue of state law, the principles of convenience, fairness, and judicial economy favor continuing to exercise supplemental jurisdiction. See Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 357 (1988); see also 28 U.S.C. § 1367(c).

Porter v. City of Manchester, 151 N.H. 30, 42 (2004)) (noting that "[r]elatively minor abuse of an employee" does not constitute constructive discharge).

Here, Casey cites months of "frustrations" and points to numerous violations of what he claims are his rights under USERRA. Doc. 21 at 15-17. SMB acknowledges that Casey consistently raised concerns about his rights under USERRA but nevertheless argues that there was "nothing exceptional or objectively unbearable" about his working conditions such that a reasonable employee would have felt compelled to resign. Doc. 20-1 at 17-20. In support of this argument, the bank notes that it addressed most of his concerns promptly and in his favor. Nonetheless, I conclude that Casey has set forth sufficient evidence for a jury to find that he was constructively discharged.

Casey's difficulties with SMB began in May 2021 while he was still on active duty and continued even beyond his resignation in December 2021. Over those six months, SMB threatened to revoke his job if he did not return from active duty by June 1, denied him immediate benefits upon his return from active duty, and tried to force him to either make up shifts he missed due to military service or use PTO to cover those shifts.

Though SMB is correct that most of these issues were eventually resolved in Casey's favor, SMB's actions nonetheless support Casey's claim of a pattern of adverse working conditions. Casey was forced to not only

16

continually advocate for his rights as a military employee, spending time and effort researching his rights under federal law, but also to endure disparaging remarks about himself and his commitment to serving our country. For example, on several occasions, his branch manager and assistant branch manager seemingly pitted his employment at SMB against his military service, such as by asking him whether the military wanted him to give up a chance at a career, stating that he chose to be in the military and thus deserved the resulting employment challenges, and remarking that he didn't work full-time because he occasionally missed shifts due to his military service. This evidence is minimally sufficient to permit a jury to find that Casey's working conditions were so difficult that a reasonable military employee would feel compelled to resign.

2. Impermissible Motivation

New Hampshire law next requires that the "employer's actions, which render working conditions so difficult and intolerable that a reasonable person would feel forced to resign, must be motivated by bad faith, retaliation or malice." Karch, 147 N.H at 536. SMB contends that there is no evidence that the bank was motivated by any bad faith or malice and instead attempts to cast Casey's "concerns and issues" as nothing more than "confusion or misunderstandings about USERRA." Doc. 20-1 at 21. However, construing all

17

reasonable inferences in Casey's favor, a jury could reasonably find that SMB's actions were spurred by impermissible motives.

Under New Hampshire law, "[b]ad faith or malice on the part of an employer may be established" where "(i) an employee is discharged for pursuing policies condoned by the employer, (ii) the record does not support the stated reason for the discharge, or (iii) disparate treatment was administered to a similarly situated employee." Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 44 (1st Cir. 2001).

Here, SMB had a Military Policy entitling military employees to "retain certain rights with respect to reinstatement, seniority, layoffs, compensation, and benefits as required by [USERRA] and any other applicable federal or state laws." Doc. 20-13 at 1. Thus, it specifically sanctioned an employee's rights under USERRA. While it is certainly possible that SMB's management and human resources department may have been genuinely confused or mistaken as to what benefits were protected under the law, considering the pattern of continued infringements, pushback, and disparaging comments Casey experienced, a jury could also reasonably infer that SMB's actions and behaviors were motivated by bad faith or malice.

    3.    <u>Public Policy</u>

Lastly, the employee must have been terminated because he "performed acts that public policy would encourage." Donovan, 175 N.H. at

18

492. Here, SMB argues that Casey's "[q]uestioning [of] the allocation and use of PTO or whether he would be scheduled to work hours on a regular day off does not invoke public policy," and thus, his claim must fail. Doc. 20-1 at 20. I disagree.

For the purpose of a wrongful termination claim, a public policy may be derived from either a non-statutory policy—such as those determined by the "interests of society and the morals of the time," Ingalls v. Walgreen E. Co., 2011 DNH 205, 2011 WL 6178829, at *4 (D.N.H. Dec. 13, 2011) (cleaned up)—or a statutory policy—which may "arise from federal as well as state" provisions, Slater v. Verizon Commc'n, Inc., 2005 DNH 023, 2005 WL 488676, at *3 (D.N.H. Mar. 3, 2005). "[O]rdinarily," the question of whether such a public policy exists "is a question for the jury." Short v. Sch. Admin. Unit No. 16, 136 N.H. 76, 84 (1992). Only when the "presence or absence of such a public policy is so clear," may the court "take the question away from the jury" and "rule on its existence as a matter of law." Id.

USERRA has three primary purposes: (1) "to encourage noncareer service" in the military by "eliminating or minimizing the disadvantages to civilian careers and employment which can result from such service"; (2) "to minimize the disruption to the lives of" military employees as well as their employers, fellow employees, and communities "by providing for the prompt reemployment of such persons upon their completion of such service"; and (3)

19

"to prohibit discrimination against persons because of" their military service. § 4301(a). Accordingly, protecting one's rights under USERRA is clearly something that public policy would encourage.

A jury could also reasonably find that Casey's concerns and actions—such as disputing any waiting period prior to the reinstatement of his benefits or contesting SMB's new military PTO policy—were in pursuit of protecting such rights and therefore that his actions were sanctioned by public policy. Thus, in sum, SMB has not demonstrated that it is entitled to summary judgment on Casey's wrongful termination claim.

## IV.   CONCLUSION

For the reasons set forth above, SMB's motion for summary judgment (Doc. 20) is granted with respect to his USERRA claim and denied with respect to his wrongful termination claim.

SO ORDERED.

/s/ Paul J. Barbadoro
Paul J. Barbadoro
United States District Judge

May 22, 2024

cc:   Counsel of Record

20